UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                                     :
                                           :
DRG FUNDING CORPORATION                    :     Civil Action No. 1:07-CV-01420-JR
_____          :
                                           :
U.S. DEPARTMENT OF HOUSING AND :                 On Appeal from the
URBAN DEVELOPMENT,                         :     United States Bankruptcy Court
                                           :     for the District of Columbia
                    Appellant,             :
                                           :     Bankruptcy Case No. 94-00417
v.                                         :              Chapter 7
                                           :
WENDELL W. WEBSTER, Trustee,               :
                                           :
                    Appellee,              :
                                           :
NEW ENGLAND PHOENIX CO., INC.,             :
                                           :
          Appellee-Intervenor.             :
_____          :

SUPPLEMENTAL BRIEF ON APPEAL FOR THE APPELLEE-INTERVENOR
NEW ENGLAND PHOENIX CO., INC.

David K. Monroe, Bar No. 358763
GALLAND KHARASCH GREENBERG
FELLMAN & SWIRSKY, PC
1054 Thirty-First Street, NW
Washington, DC 20007-4492
Telephone:      202/342-5200
Facsimile:      202/342-5219
Email:          dmonroe@gkglaw.com

John M. Keough
NEW ENGLAND PHOENIX COMPANY, INC.
337 Freeport Street
Boston, MA 02122
Telephone:      617/288-0612

Attorneys for Appellee-Intervenor
NEW ENGLAND PHOENIX COMPANY, INC.

## Introduction[1]

NEPCO files this supplemental brief with the leave of this court (per Robertson, J.) granted at the hearing held on January 11, 2008. The prior briefs of the parties focused on whether the bankruptcy court's approval of the Successor Trustee's assignment of the Judgment to NEPCO was proper under the "operation of law" exception to the Act. The purpose of this brief is to address a second reason that the Order may be affirmed. As explained more fully below, the Judgment is not a "claim" for the purposes of the Act, and, consequently, the Act does not apply to the Successor Trustee's assignment in the first place.[2]

## The Judgment is Not a "Claim" under the Act

As a preliminary matter, the Act applies only to the transfer of a "claim" before it has been allowed and the amount determined. 31 U.S.C. §3727.[3] In other words, the Act only applies to un-allowed and unliquidated claims; once a claim is allowed and the amount fixed, the Act no longer applies. *Brooke's Case*, 12 Op.Atty.Gen. 216 (1867) (debt settled by judgment

---

[1]  Capitalized terms herein shall have the same meaning as defined in NEPCO's prior brief for the appellee unless otherwise noted.

[2]  NEPCO made this argument in the bankruptcy court, but it was rejected. See Memorandum, pp. 14-17.

[3]  The Act reads in pertinent part:

§ 3727. Assignments of claims

(a) In this section, "assignment" means--

(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or

(2) the authorization to receive payment for any part of the claim.

(b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

2

against the United States not within the purview of the Act) [copy attached as Addendum 1];

*Burke v. Davis,* 3 F. 456, 458 (Cir. Ct. N.D. Ill. 1894) (judgments for refund of excess duties are

not claims within the meaning of the Act); *see also Claims Against the United States*, 17

Op.Atty.Gen. 545 (1883) (the Act does not apply to claim against the United States about which

there is no question as to its validity or extent) [copy attached as Addendum 2];

In this case, DRG's prior claim against HUD was fully litigated and reduced to a final

judgment. A judgment is not a mere "claim" for the purposes of the Act; it is a judicially

established debt. There is no uncertainty about the amount or validity of the Judgment against

HUD. The Judgment constitutes an undisputed debt *owed by* HUD, FHA, and GNMA, in the

principal sum of $4,379,745.13. (A copy of the Judgment is attached as Exhibit 3 to Appellee's

Appendix). *See United States v. Jones*, 119 U.S. 477, 480 (1886) (government accounting

officers have "no authority to re-examine the judgment [against the United States]  . . .  which

is conclusive as to everything it embraces"). Consequently, the Act's limitation on the

assignment of "claims" against the government does not apply to the Judgment in the first place.

Moreover, it is clear that Congress understands the difference between a mere "claim"

and a "judgment," as evidenced by the federal setoff-against-judgment statute. 31 U.S.C. §3728

("Section 3728"). Section 3728(b), the very next section under Title 31 after the Act, mandates

that the government must bring a "civil action" to establish its countervailing debt in order to

effect a setoff of a judgment against the United States.[4]

---

[4]     In this case, HUD ignored the clear mandate of Section 3728 when it failed to bring a civil action against DRG
to establish its alleged debt and instead relied upon administrative offsets, which are ineffective to setoff against a
judgment. The question of whether HUD has the authority to avoid paying a judgment by administrative fiat is at
the heart of the first issue in the incomplete administrative offset process. HUD's questionable interpretation of its
authority and noncompliance with Section 3728 (as well as its own regulations) have not been susceptible to judicial
review because HUD has failed to come to any final agency decision on the matter. HUD may be right, or HUD
may be wrong, but it is the judicial branch, not HUD itself, that should have the final word on this issue of law.

HUD refuses to pay the Judgment because it asserts that it has certain claims *against* DRG, arising from internal reimbursement made by FHA to GNMA.[5]  Thus, the only remaining uncertainty in this matter does not involve a "claim" against HUD at all.  The uncertainty arises entirely from HUD's administrative claims, and the Act simply has no relevance to the resolution of claims held by the government against another.  Stated another way: the Act, by its express terms, pertains only to *defensive* actions involving un-allowed and unliquidated claims asserted against the government.  HUD's attempt to invoke the Act in this case is fundamentally flawed because the alleged administrative offsets at issue are not "claims" *against* the government, they are claims *by* the government.

The first step in reconciling the Judgment against the alleged administrative offsets is simply to require HUD to come to a "final" agency decision on the two issues involved in the administrative process, to wit: (i) whether HUD has the authority to collect its debts via offset, and (ii) the amount of any debt allegedly owed by DRG to HUD.  Why should it matter to HUD whether it provides its final decision and accounting to DRG, the bankruptcy trustee, or NEPCO?  HUD has already set forth the sums allegedly due in the prior-offset notices so, presumably, the documentation and accounting to substantiate the offsets has been compiled.  Moreover, it is important to emphasize that HUD's administrative offsets are based upon internal reimbursements allegedly made by FHA to GNMA *after* DRG was defaulted and GNMA took over six real estate projects that are the subject of the administrative offsets.  *See* Munson Affidavit ¶¶ 11-15, 18-21 ("This amount [the alleged administrative offsets] represented reimbursement by the FHA to GNMA resulting from DRG's default under GNMA's mortgage-backed securities program.").

---

[5]    The amount of HUD's claims against DRG total about $5.8 million according to HUD's preliminary agency action as set forth in the two, prior-offset notices sent to DRG

The construction of the word "claim" argued by NEPCO in this supplemental brief is supported by an early opinion of the United States Attorney General. In 1867, in *Brooke's Case*, *supra*, Attorney General Henry Stanbery ruled that an assignee of a federal court judgment against the United States was entitled to payment notwithstanding the Act. General Stanbery's reasoning is as sound today as when it was written: "[The judgment] is not described as a 'claim,' and it ceases to have the character of a claim after it has passed into a judgment. A debt, therefore, settled by judgment, and due from the United States, does not seem to me to come within the purview of the act of 1853 [the earlier version of the Act]." 12 Op.Atty.Gen. at 221;[6] *see Burke v. Davis,* 63 F. 456, 458 (Cir. Ct. N.D. Ill. 1894) (judgments for refund of excess duties are not claims within the meaning of the Act).

Nothing in the Act or the authorities interpreting it remotely supports the proposition that the Act should be applied when the government asserts affirmative claims against another, as is the case here. The Act is intended as a shield when there are un-allowed and unliquidated claims asserted against the government; HUD is attempting to misuse the Act as a sword against NEPCO in an effort to avoid payment of the Judgment through its own administrative inaction. HUD should simply come to its final agency decision on the two issues involved in the offset process and permit NEPCO to review its decision and the documents supporting it.

If this matter ever returns to court, the issue will not be the extent or validity of HUD's debt to DRG, because that debt is set in stone by the Judgment, the only issues will involve the extent and validity of DRG's alleged debt to HUD.[7]  Thus, the term "claim" as used in the Act

---

[6]    *Brooke's Case* involved an earlier version of the Act, but the relevant language then was not materially different from the present version of the Act: "All transfer and assignments hereafter made of any claim upon the United States, or any part or share thereof, or interest therein. . ." *Id.* at 220-21; *compare with* 31 U.S.C. § 3727(a)(1).

[7]    In its reply brief, HUD faults DRG and its bankruptcy trustee for not doing more to collect on the Judgment. But this argument ignores the record and stands reason on its head. DRG diligently prosecuted its claim against

does not encompass the Judgment because that debt has been allowed in an amount fixed by the

court and no longer has the character of an un-allowed and unliquidated claim.

### Conclusion

For all of the above reasons, the bankruptcy court's decision to approve the assignment of

the Judgment by the Successor Trustee to NEPCO should be affirmed.

Respectfully submitted,

David K. Monroe, Bar No. 358763
GALLAND KHARASCH GREENBERG
FELLMAN & SWIRSKY, PC
1054 Thirty-First Street, NW
Washington, DC 20007-4492
Telephone:     202/342-5200
Facsimile:     202/342-5219
Email:          dmonroe@gkglaw.com

John M. Keough
NEW ENGLAND PHOENIX COMPANY, INC.
337 Freeport Street
Boston, MA 02122
Telephone:     617/288-0612

DATE:  January 24, 2008                     Attorneys for Intervenor

---

HUD to a final judgment in DRG/HUD I (and HUD has never explained why it did not plead its administrative
offsets in counterclaim thereto). Next, DRG sought *mandamus* to compel payment in DRG/HUD II, only to be told
that it must await completion of HUD's administrative process. Finally, the Initial Trustee in bankruptcy sought and
obtained relief from the automatic stay to permit HUD to reach its final agency decision. The ball is and always has
been in HUD's court with respect to bringing this longstanding dispute to a conclusion. HUD appears to take the
absurd position that DRG, having proved the debt owed to it by HUD in federal court litigation, now has some
further affirmative duty to *disprove* the amounts alleged to be owed as administrative offsets. This further ignores
the fact that HUD alone possesses all relevant documents (if any) supporting the offsets, which it thus far deigns not
to share with anyone outside the agency.

The more pertinent question is why, if it was owed a large debt from DRG, HUD never filed a proof of claim in
the bankruptcy? Is it because HUD wishes at all costs to avoid any judicial review of its questionable use of
administrate offsets? This is a fair question, especially given that HUD has never provided any documentation to
further explain or substantiate these debts. Whatever the case may be concerning what HUD may (or may not) have
in the way of evidence of the administrate offsets, it is clear that HUD is playing a dangerous game by insisting that
it may avoid and render unenforceable the Judgment by administrative fiat and without any judicial review. *See e.g.*
*Hines v. United States*, 105 F.2d 85 (D.C. Cir. 1939) (government not permitted to set-off judgment against it by
"mere administrative finding of indebtedness"); 31 U.S.C. §3728 (government required to bring a "civil action" in
order to setoff against a judgment against the United States).

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document was delivered to the following addressees at the addresses stated by depositing same in the United States mail, first class postage prepaid, this 24th day of January 2008:

Wendell W. Webster, Trustee
WEBSTER FREDERICKSON & BRACKSHAW
1775 K Street, NW – Suite 600
Washington, DC 20036
Telephone:    202/659-8510

Glenn D. Gillett
U.S. DEPARTMENT OF JUSTICE
Civil Division – Room 10018
1100 L Street, NW
Washington, DC 20005
Telephone:    202/514-7162
Email:        glenn.gillett@usdoj.gov

Attorneys for Appellant
U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT

Dennis Early
Office of the U.S. Trustee
115 South Union Street – Suite 210
Alexandria, VA 22314
Telephone:    703/557-7176

Linda D. Thomas

# ADDENDUM 1

HON. HENRY STANBERY

Brooke's Case.

## BROOKE'S CASE.

1. An attorney of record of the claimant in a case prosecuted to judgment against the United States in the Court of Claims has no lien on the judgment, or on the money payable under it, for his fees as such attorney; nor has he any equitable interest in the judgment, or the money payable upon it, which the Government is bound to protect in payment of the judgment

2. A debt settled by judgment in the Court of Claims, and due from the United States, does not come within the purview and operation of the 1st section of the act of February 20, 1853, relative to the assignment of claims against the United States.

ATTORNEY GENERAL'S OFFICE,
*July* 25, 1867.

SIR: I have examined the case of Mr. Jolliffe, referred here for my opinion, on the following facts and questions:

Francis J. Brooke, by his attorney, John Jolliffe, Esq., prosecuted a claim against the United States in the Court of Claims, upon which judgment was recovered at the December term of said court, 1866, for the sum of $2,080 72.

Mr. Jolliffe subsequently brought a certified copy of the judgment (on the margin of which his name appeared as attorney of record) to the Treasury Department for payment, which, under the rules of the department, was declined during the ninety days allowed for an appeal to the Supreme Court.

Subsequently, Mr. W. S. Huntington, cashier of the First National Bank of Washington, presented a copy of the judgment, with an assignment thereof from Brooke, accompanied by a power of attorney authorizing Huntington to collect the same.

Before payment, Mr. Jolliffe interposed, claiming his fees as attorney, and asserting a lien on the judgment therefor, alleging that the assignment had been made without his knowledge and against his right; and thereupon payment was suspended by direction of the First Comptroller of the Treasury to await the decision of the following questions, viz:

TO

1. W[...]
the judg[...]
fees?
2. W[...]
the atto[...]
of the j[...]
3. If[...]
paid?
As to[...]
attorney[...]
money [...]
The C[...]
peculiar[...]
for the [...]
Its of[...]
by fees[...]
amount[...]
terest a[...]
Unde[...]
court, l[...]
judgme[...]
general[...]
satisfac[...]
tary of[...]
by the[...]
chief j[...]
of said[...]
to the l[...]
in the c[...]
Ther[...]
relating[...]
attorne[...]
solicito[...]
the co[...]
these r[...]
and cer[...]
of these[...]
practici[...]

Brooke's Case.

1. Whether the attorney in this case has a lien upon the judgment, or rather upon the sum recovered, for his fees?

2. Whether the whole sum recovered should be paid to the attorney, to be accounted for with the proper owner of the judgment?

3. If not paid to the attorney, to whom should it be paid?

As to the first question, whether Mr. Jolliffe, as the attorney of record, has a lien on this judgment, or on the money payable under it, for his fees as such attorney?

The Court of Claims, as established by statute, has some peculiar features. It is a court of limited jurisdiction and for the investigation of claims against the United States.

Its officers are compensated by fixed salaries, and not by fees or costs. Its judgments are rendered for the amount found due to the claimant, generally without interest and always without costs.

Under certain rules and regulations established by the court, lawyers are admitted to practice before it. Final judgments obtained in this court are to be paid out of any general appropriation made by law for the payment and satisfaction of private claims, on presentation to the Secretary of the Treasury of a copy of the judgment, certified by the clerk of the Court of Claims, and signed by the chief justice, or, in his absence, by the presiding judge of said court; and such payment is to be a full discharge to the United States touching any of the matters involved in the controversy.

There is no provision anywhere in the acts of Congress relating to this court prescribing the duties or rights of attorneys who may practice therein, except only the proper solicitors of the United States; but authority is given to the court to establish rules of practice therein. Under these rules counsel are admitted to practice in that court, and certain qualifications are required of them; but none of these rules provide for any lien on behalf of an attorney practicing therein for his fees, either upon judgment re-

to judgment
lien on the
s such attor-
r the money
in payment

ne from the
ation of the
assignment

'E,

, 1867.

referred
nestions:
ffe, Esq.,
he Court
t the De-
2,080 72.
y of the
eared as
for pay-
ent, was
ppeal to

of the
copy of
Brooke,
Inuting-

iing his
idgment
n made
d there-
e First
n of the

Brooke's Case.

covered by his client or upon the money payable on such judgment.

I am not aware that any law of the United States, as to attorneys at law practicing in the courts of the United States, gives them any lien on a judgment recovered for their general fees.

Provision is made by the 2d section of the act of February 26, 1853, by which docket-fees, ranging from $5 to $20, are allowed to the attorney of the successful party, and taxed in the bill of costs. But it is not understood that this provision as to the docket-fees applies to judgments rendered in the Court of Claims.

In England, and in some of the States of the Union, there is a lien in favor of that class of lawyers called attorneys and solicitors, for such fees as are fixed by law or usage, and which, in general, constitute a part of the taxable costs of the case. The grounds upon which such a lien is recognized have, in my judgment, no application in such a court as this Court of Claims, and to the general fees of counsel practicing therein. I do not say that, if Mr. Jolliffe had received the money from the department as the attorney of record, he might not then have retained his fees. But the lien there would arise out of possession of the money, which is quite a different thing from the lien here sought to be established, where the possession of the thing is not in the party who claims the lien.

I therefore answer your first question, that Mr. Jolliffe has no lien either upon the judgment or upon the money which it represents.

I have said that the attorney in this case has no lien for his services; nor has he any equitable interest in the judgment, or the money payable on the judgment, which the department is bound to take notice of and protect in payment of the judgment.

If any question should arise as to this point, I find it settled in an opinion of my predecessor, Mr. Attorney General Bates. Bristol, a citizen of the United States, had a claim against the republic of Costa Rica, which

Brooke's Case.

was submitted to a joint commission of both governments for adjudication, and was prosecuted to a final award in favor of claimant by Rider, his attorney, under a power authorizing him to prosecute the claim, and to demand, recover, and receive the money. After final award was made, the claimant gave another power of attorney to Foster and Thompson, authorizing them "to collect the instalments as they should become due under the award," and they claimed payment under this power. The amount of the award having been received by the State Department from Costa Rica for the purpose of payment, the question was as to the propriety of the department making payment to the last-named attorneys.

Mr. Bates says, "upon the case stated, I have no doubt at all about the propriety of paying the money to Foster and Thompson. To refuse to do it would be to deny the right of Bristol to choose his own agents and attorneys and to change them at his own pleasure.

"A power coupled with an interest has been sometimes held by the courts not revocable at the pleasure of the grantor. But here there is no apparent interest in Rider. The claim was Bristol's, not Rider's; and there is no suggestion even that Rider had any *legal* interest in it. It is indeed suggested that Rider obtained an *equitable* interest in the claim (not by virtue of any prior right in the subject-matter, but) *by prosecuting it up to the award.* I confess my inability to see how any equitable claim upon the fund can accrue to him on that account. Nothing is said in the statement about fees or compensation; and if we must assume that fees were earned and due, still, in the absence of special contract, such fees do, undoubtedly, constitute a general charge against the client, and not a specific lien upon the subject-matter of the suit.

"The right of Bristol to receive his money by the hands of his chosen attorneys, Foster and Thompson, seems to me a plain legal right. And I think it would be prudent in the department to follow the law, and leave the parties

Brooke's Case.

to settle their conflicting equities, if any they have, before the judicial tribunals."

The equitable interest of the attorney in the fund recovered being put upon the ground of labor or services bestowed in the prosecution of the claim, it can make no difference whether the claim was prosecuted before a court or a commission; and this question may accordingly be considered disposed of by the opinion above quoted.

There is no pretence of any legal interest acquired by Mr. Jolliffe in virtue of any assignment made prior to the judgment. Indeed, such an assignment, made before the claim had passed into a judgment, and while it yet stood merely on the footing of an unliquidated claim, seems to me forbidden by the act of 1853.

The first assignment brought to my notice which carried any legal interest in the claim was that made after judgment to Mr. Huntington.

The only question remaining for consideration is, whether payment can now be made to Mr. Huntington upon the footing of that assignment and the accompanying power of attorney? The 7th section of the act of Congress establishing the Court of Claims provides as follows: "In all cases of final judgments by the said court, or on appeal by the Supreme Court, where the same shall be affirmed in favor of the claimant, the sum due thereby shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims, on presentation to the Secretary of the Treasury of a copy of said judgment, certified by the clerk of said Court of Claims, and signed by the chief justice, or, in his absence, by the presiding judge of said court."

A question is made by Mr. Jolliffe, whether a judgment of the Court of Claims is to be put on the footing of a claim against the United States, under the 1st section of the act of February 20, 1853. That section is in these words: "All transfers and assignments hereafter made of any claim upon the United States, or any part or share

Brooke's Case.

thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless the same shall be freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

If this judgment is to be considered still in the light of a claim upon the United States, within the meaning of the section just quoted, then no assignment thereof is valid until after a warrant has been issued for its payment.

I am advised that the uniform practice and usage in the Treasury Department has been to recognize assignments and powers of attorney to collect and receive such judgments from the Treasury as valid when made after the recovery of the judgment and before the issuing of a warrant for its payment.

It has been shown that, in the act of Congress which directs the payment of such judgments at the Treasury Department, the money recovered by the judgments in the Court of Claims is considered as a debt due by the United States. It is not described as a "claim," and it ceases to have the character of a claim after it has passed into a judgment. A debt, therefore, settled by judgment, and due from the United States, does not seem to me to come within the purview of the act of 1853. Besides, as has been stated, I am advised that the uniform construction and practice in the Treasury Department is, to recognize assignments and powers of attorney to receive these judgments as valid when made after the judgments are recovered and before the issuing of a warrant.

If the question were more doubtful than it seems to me to be, this uniform usage would settle such a doubt.

Attorney General Taney, in an opinion given on the 22d of March, 1833, (Opinions of Attorneys General, vol. 2, p. 558,) says: "Whenever an act of Congress has, by

actual decision, or by continued usage and practice, received a construction at the proper department, and that construction has been acted on for a succession of years, it must be a strong and palpable case of error and injustice that would justify a change in the interpretation to be given to it."

I am therefore of opinion, that, if the assignment and power of attorney to Mr. Huntington are in proper form, he is entitled to receive the amount of the judgment. Mr. Jolliffe no doubt has rendered valuable service to his client, for which he is entitled to compensation, but which, in their administrative duties, the officers of the Treasury cannot be required to consider or decide upon. They are only authorized to pay where the legal right to the money is established by a proper assignment and warrant of attorney. And Mr. Jolliffe must be left to such remedy as he may have, either against his client or against the assignee of the judgment.

I am, sir, very respectfully,

Your obedient servant,

HENRY STANBERY.

Hon. HUGH McCULLOCH,
    *Secretary of the Treasury.*

---

### PAY OF RETIRED NAVAL OFFICERS.

The construction of the 20th section of the act of July 16, 1862, adopted by the Attorney General in his opinion of May 18, 1867 upon this subject, (*supra*, p. 138,) defended.

ATTORNEY GENERAL'S OFFICE,
    *August 1, 1867.*

SIR: In the opinion communicated to you, under date of the 18th of May last, the result of an examination of the 20th section of the act to equalize the grade of officers, etc., approved July 16, 1862, in *pari materia* with the system of kindred statutes, was substantially to the effect, that

# ADDENDUM 2

s

ice to duties on the
making associations,
the same provisions
s on the capital and
here is no ground for
iminate between the
e scope and effect of
is to relieve not only
banks and bankers,
h as were "due and
t.

evised Statutes, has
ions of that section
3, 1883, seem to be
it act) include "any
" under the statute
S3, banks, bankers,
not liable for the
le therefor until the
ice as to such duties
incurred"—nothing
operation of the re-
applicable to that
100 U. S., pp. 549,

aties are not assess-
nd capital stock of
period between the
January 1, 1883, nor
nks and bankers for
e act and December

ient answer to the

etfully,
IS BREWSTER.

## CLAIMS AGAINST THE UNITED STATES.

The provisions of section 3477, Revised Statutes, touching transfers and assignments of claims against the United States, and powers of attorney, etc., for receiving payment thereof, do not apply to undisputed claims, or any claim about which no question is made as to its validity or extent.

Where a contract was made for roofing a court-house at a fixed price, and a power of attorney given to receive a part of such price as security for material purchased by the contractor: *Advised* that the power was not affected by section 3477, as no doubt existed concerning the right of the contractor to receive the amount so secured.

DEPARTMENT OF JUSTICE,
*May* 28, 1883.

SIR: Yours of the 3d of February last asks whether the word "claim" in section 3477 of the Revised Statutes includes claims against the United States that are *liquidated* as well as those that are *unliquidated*, and in this connection three cases are stated as illustrating the question pending before you.

The provision in section 3477 to which you refer is as follows: "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

The expression "claim," as is well known, is one of the most comprehensive in the vocabulary of the law. The only question here, therefore, is how far the purview or the history of the above statute indicates that this word is employed therein in some, and if so what, more narrow sense.

The above passage comes originally from the act of 1853, chapter 81, and it remains in the words in which it was first

### Claims Against the United States.

introduced by Mr. Badger, in April, 1852, at the Congress preceding that in which it became a law. (Globe, Vol. XXIV, part 2, pp. 984, 1128.) Its author was well known as an eminent lawyer, and an especially skillful draughtsman. Originally the bill which contained it was entitled "An amendment of the act of 1846, chapter 66." When taken up at the next Congress its scope was somewhat enlarged, and the title changed. However, its connection with the act of 1846 remained apparent in the body thereof.

The act of 1846 regulated assignments, etc., of such claims as are *allowed by Congress*. Upon its passage through the House of Representatives it seems to have been under the charge of Mr. Thurman, but there is no report of debate in either house, so far as I have found. It is a part of extensive legislation upon matters of finance, which distinguishes that year, and its promise of benefit was probably universally admitted.

When first introduced Mr. Badger's bill made void not only all assignments and powers of attorney affecting claims, but likewise *all contracts whatever for compensation to claim agents.* At its second appearance this latter provision was omitted (Globe, Vol. XXVI, pp. 242, 288.) The legislature therefore *deliberately* refused to interfere in the matter of compensation as between claimants and their agents, excepting so far as the compensation operated *in rem*. It is in conformity with this principle that the act of 1853 specifies *protection of the United States* against fraud as its *sole* purpose. It should be added that such second appearance was because of its adoption by a special committee of the House, theretofore raised to inquire about and report upon the *Gardiner claim*, at that time so notorious.

By its connection with the act of 1846, therefore, as well as by that with the Gardiner claim, and by its significant omission above mentioned, the act of 1853 reminds the reader of the common law policy against *maintenance* and *champerty ;* and this suggestion is strengthened by the title at length adopted, which in turn finds an analogy in the circumstance that the offenders just named are rated at common law with that class which affects *public justice*, irrespective of any in-

Claims Against the United States.

the Congress
, Vol. XXIV,
nown as au
traughtsman.
d "An amend-
ken up at the
, and the title
ct of 1846 re-

of such claims
 through the
en under the
t of debate in
 part of exten-
 distinguishes
ly universally

nade void not
fecting claims.
*ation to claim*
 provision was
he legislature
 matter of com-
ents, excepting

It is in con-
3 specifies *pro-
ts sole purpose.*
ce was because
House, thereto-
n the *Gardiner*

efore, as well as
 its significant
ninds the reader
and *champerty ;*
 title at length
ne circumstance
mmon law with
ctive of any in-

jury to such private persons as are incidentally oppressed thereby.

Another circumstance to the same effect is to be found in the clause (above) " whatever may be the consideration therefor," which probably originated in the fact that this doctrine as to the "consideration" necessary to constitute common law champerty, *i. e., maintenance of the suit*, was regarded as too narrow for public exigencies in 1852–'53. I submit that this clause is an *ear-mark*, indicating that the legislature assumed the common law as to champerty as a point of departure, and so was under an impression, and intended that, except as expressly otherwise provided, that department of the common law would give the rule for interpreting the statute in parts analogous.

To the same general effect is the exact enumeration by the statute of the circumstances under which alone assignments and powers of attorney are therein authorized; viz, "allowance," "ascertainment," and "warrant for the payment." I submit that the former words are *emphatic*. If they are not emphatic they are *superfluous*, for all "warrants for payment" are *necessarily* preceded by either or both; and where not by both, the above enumeration is of course to be taken distributively. But in any case if the specification of *allowance* and *ascertainment* is not ex industria, it is *surplusage*; a conclusion which, of course, is not to be drawn if reasonably to be avoided. If they are emphatic, this feature coincides with the others just mentioned in showing that *a general atmosphere or color derived from the doctrines of champerty affects the topics before us.* I mean that some sort of *litigation* of the "claim," either in Congress or before an Executive Department, is taken for granted. There may be no *technical difference* between the respective methods for the payment of the salary of a United States judge, and for that of a claim which in the event undergoes a course of several years' litigation in the Treasury Department. But for some purposes there is an important difference, and that not only as to the means of success employed by such as are attorneys to collect them. (In point of fact where the United States are clearly debtors as claimed, the matters preliminary to warrant for payment amount to

no more than a presentment of a promissory note to the
debtor himself; but when doubt arises upon the claim, the
officers of the Treasury assume consciously *judicial* functions;
the affair loses its pro forma *ex parte* character, sides are
taken by the creditor and debtor, and the auditors, comp-
trollers, etc., act as if inquiring into a question *inter alios.*
Such also as this latter kind of proceeding is that where no
law exists to authorize payment, and an application to Con-
gress for private legislation becomes necessary.  It is not
singular, therefore, or merely casual, that section 3477, which
is compounded of the acts of 1846 and 1853, should in accord-
ance with a marked trait in Anglo-Saxon legislation show
upon its face that it deals with a *specific evil,* to which the
attention of Congress had actually at the time been drawn;
and is not meant as an abstract and universal statutory pro-
vision shaped by square and compass, or as broad, say, as
the word "*clameum,*" spoken of by Coke as the most com-
prehensive in the law.

Comprehensiveness in meaning is not infrequently akin to
vagueness, and consequently to obscurity; so that it is not
unusual for interpreters of legal documents to color or
restrain general terms occurring therein by *specific* words
associated therewith, or by matters connected with their
history.  In the present instance, as has been shown, we
may bring both of these influences to bear.

In this connection it is significant that a subsequent clause
in section 3477 *expressly excludes conclusion* that the phrase
"all transfers" therein means less than "all," whilst there is
no such pains taken with the adjoining phrase, "any claim."
Apparently, then, the latter is left of purpose to such color
as the context, etc., may suggest.

It is also pertinent to the general question to observe that
the second section of the act of 1853 made it indictable for
officers of the United States to "prosecute any claim" as
agent or attorney.  I take it that "prosecution" in this place
denotes any method by which "a claim" may be recovered;
and therefore that it varies *secundum subjectam materiam*
of the class of claims to which it may be actually applied.
If the word claim here is to have the meaning assigned by
Coke, then for one class *presentation* thereof is *prosecution,*

TO  THE

and a public offi
an absent friend
without compensa
no matter how pl
pression *prosecut*
this second secti
matters above su
Congress was th
otherwise expres:
*champerty.*

It is therefore
law it is not cha
a debt (from, *ex.*
sentation thereof
should be, as the
the debt by the p
either in pais or i
is allowable.  A1
that the assignc
made over to hir
precedent debt,
tended maintena
chapter 83, sec. 1
*l'igation,* unless
assignments of
common law.  V
statute of 1853, l
gards *considerati*
tion concurring
*proves the rule* i
tion still conten
virtual *quarrel* o:
creditor and the
claim as is withi

Considerations
course most apt
minister its pro
case, therefore, i
raneously the Fi
announced, as a

Claims Against the United States.

ry note to the
the claim, the
*licial* functions;
acter, sides are
uditors, comp-
tion *inter alios.*
; that where no
lication to Con-
sary.  It is not
ion 3477, which
iould in accord-
gislation show
*il,* to which the
ie been drawn;
l statutory pro-
broad, say, as
the most com-

quently akin to
so that it is not
ts to color or
r *specific* words
ted with their
een shown, we

bsequent clause
that the phrase
" whilst there is
se, "any claim."
ie to such color

t to observe that
it indictable for
e any claim" as
ion" in this place
iy be recovered;
*jectam materiam*
ictually applied.
iing assigned by
of is *prosecution,*

and a public officer would become indictable if in behalf of
an absent friend he were to present to the Treasury, even
without compensation, any account against the United States,
no matter how plainly due.  But I apprehend that the ex-
pression *prosecute* gives the same color to the word *claim* in
this second section that in the first is reflected from the
matters above suggested, and so that it aids in showing that
Congress was thinking of, and except as actually therein
otherwise expressed was guided by, the ancient policy as to
*champerty.*

It is therefore pertinent to observe here that at common
law it is not champerty to stipulate for a share in collecting
a debt (from, *ex. gra.,* some distant debtor) by a mere pre-
sentation thereof.  For that effect it is necessary that there
should be, as the books say, a *quarrel* or *taking* of *sides* about
the debt by the parties thereto.  If no such dispute exists,
either in pais or in court, compensation to a proposed collector
is allowable.  And even in case of suit in court it is "certain
that the assignee of a bond or other chose in action, being
made over to him for good consideration in satisfaction of a
precedent debt, and not merely in consideration of the in-
tended maintenance," is not champerty.  *Hawkins* (Book 1,
chapter 83, sec. 17), and others.  That is even where there is
l' :gation, unless there is also *a particular sort of consideration,*
assignments of the kind just mentioned are not invalid at
common law.  We have seen that section 3477, following the
statute of 1853, has expressly changed this rule so far as re-
gards *consideration.*  And, as already submitted, that excep-
tion concurring with other indications to the same effect
*proves the rule* in other respects, and consequently that sec-
tion still contemplates the existence of *litigation (i. e.,* some
virtual *quarrel* or *sides-taking* betwixt the supposed original
creditor and the United States) in order to constitute such a
claim as is within its provisions.

Considerations arising from the history of a statute are of
course most apt to occur to those who may be called to ad-
minister its provisions *contemporaneously.*  In the present
case, therefore, it is interesting to observe that contempo-
raneously the First Comptroller issued a circular in which he
announced, as a rule of action in settling demands against

**550**                HON. S. F. PHILLIPS

*Claims Against the United States.*

the Government, that the act of 1853 did not include *undisputed* claims.

I have carefully read the cases in the Supreme Court of the United States reported in 95 U. S. 407, 97 *ib.* 392, 484, and 102 *ib.* 556, and understand that the views above expressed do not conflict with anything there decided.

I have also attentively considered the opinion in Spaid's case (16 Opin., 161) to which you refer. There a questionable power of attorney *had been revoked*, and, as no *interest* was connected with the power, there was little difficulty in holding that the latter was at an end—and so Attorney-General Devens said; but he added, by the way, that the *power* itself (to collect installments from time to time upon a contract to dredge a river) was in violation of section 3477, and so had never been valid. It is important to say that *no question upon that point had been asked of him*, and from the passage quoted by you (16 Opin., page 263) in regard to "concurrence," as well upon the whole face of the opinion, it is doubtful whether that learned and able lawyer had thoroughly considered either the foundation or the effect of this *dictum.*

I hope to be understood upon the whole as advising that section 3477 does not apply to any claim against the United States about which no question is made as to its authority or extent. By "question," I mean, of course, question by some officer lawfully authorized in that behalf.

It seems, therefore, that the policy of the above section forbids that an *assignee or attorney as to the proceeds of an executory contract* (*ex gra.*, for building, dredging, etc.) shall have more than an uncertain interest therein, *i. e.*, one contingent upon the absence of any subsequent question by the United States as regards any matter which at the time of the question is in the future—such as the amount or quality of the article to be paid for.

It is hardly necessary to add that nothing in this discussion, or in section 3477, touches those claims against the United States that arise upon instruments, such as bonds, etc., the transfer, commercial character, etc., of which have been provided for by special legislation.

TO THE

To apply the a
you mention as

(1) In Jones's
court-house at a
a part of such p
purchased by th

Inasmuch as
tractor to receiv
the power is not

(2) In Snyder
the same except
therefore the sa

(3) Marshbank
contract is still
nothing can be
States which sh
at any time here
upon this contra

If at any suc
suggested above
do, an applicati
claim within sec
No "acceptance
Very res

The SECRETA

Having exam
opinion, I concu
the questions p
tion 3477 and a
presents, and I

JUNE 7, 1883.

Claims Against the United States.

To apply the above conclusion to the particular cases which you mention as pending before you:

(1) In Jones's case a contract has been made for roofing a court-house at a fixed price, and a power of attorney to receive a part of such price has been given as security for material purchased by the contractor.

Inasmuch as no doubt has arisen as to the title of the contractor to receive the amount so secured, I am of opinion that the power is not affected by section 3477.

(2) In Snyder's case the circumstances are substantially the same except that the power covers the whole price, and therefore the same result follows.

(3) Marshbank's case differs from those above, in that the contract is still executory. As I have said, it seems that nothing can be done at present upon the part of the United States which shall conflict with the operation of section 3477 at any time hereafter that a demand is made for payment upon this contract, either in whole or by installment.

If at any such time the contract is, in either of the ways suggested above, *disputed* by public officers authorized so to do, an application for payment thereunder will become a claim within section 3477, and the power consequently void. No "acceptance" can obviate this liability.

Very respectfully, your obedient servant,

S. F. PHILLIPS,
*Solicitor-General.*

The SECRETARY OF THE TREASURY.

Having examined this case and considered the above opinion, I concur with the Solicitor-General in his answer to the questions propounded and in his interpretation of section 3477 and all of the conclusions he has arrived at and presents, and I answer as he has answered.

BENJAMIN HARRIS BREWSTER.

JUNE 7, 1883.